UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN S.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:20-cv-03037-MJD-JMS |
| | ) |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | ) ) ) |
| | ) |
| Defendant. | ) |

**ENTRY REVIEWING THE COMMISSIONER'S DECISION**

Claimant John S. applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") from the Social Security Administration ("SSA") on April 26, 2018, alleging an onset date of March 9, 2018.  [Dkt. 18-2 at 16.]  His applications were initially denied on September 10, 2018, [Dkt. 18-4 at 5; Dkt. 18-4 at 14], and upon reconsideration on January 4, 2019, [Dkt. 18-4 at 25; Dkt. 18-4 at 32].  Administrative Law Judge Monica LaPolt ("ALJ") conducted a hearing on February 21, 2020.  [Dkt. 18-2 at 36-62.]  The ALJ issued a decision on March 20, 2020, concluding that Claimant was not entitled to receive benefits.  [Dkt. 18-2 at 13-25.]  The Appeals Council denied review on September 15, 2020.  [Dkt. 18-2 at 2.]

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first names and last initials of non-governmental parties in its Social Security judicial review opinions.

1

On November 19, 2020, Claimant timely filed this civil action asking the Court to review the denial of benefits according to 42 U.S.C. §§ 405(g) and 1383(c). [Dkt. 1.]

## I. STANDARD OF REVIEW

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019). Disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (citing 42 U.S.C. § 423(d)(1)(A)).

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Stephens*, 888 F.3d at 327. For the purpose of judicial review, "substantial evidence" is such relevant "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens*, 888 F.3d at 327. Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)). The Court does "determine whether the ALJ built an 'accurate and logical bridge' between the evidence and the conclusion." *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) (quoting *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014)).

The SSA applies a five-step evaluation to determine whether the claimant is disabled. *Stephens*, 888 F.3d at 327 (citing 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)). The ALJ must evaluate the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (citations omitted).[2] "If a claimant satisfies steps one, two, and three, [he] will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then [he] must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id*. The ALJ uses the RFC at Step Four to determine whether the claimant can perform his own past relevant work and if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (v). The burden of proof is on the claimant for Steps One

---

[2] The Code of Federal Regulations contains separate, parallel sections concerning DIB and SSI, which are identical in most respects. Cases like *Clifford* may reference the section pertaining to only one type of benefits. *See, e.g.*, 227 F.3d at 868 (citing 20 C.F.R. § 404.1520). Generally, a verbatim section exists establishing the same legal point with both types of benefits. *See, e.g.*, 20 C.F.R. § 416.920. The Court will take care to detail any applicable substantive differences, but will not always reference the parallel section.

through Four; only at Step Five does the burden shift to the Commissioner. *See Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Stephens*, 888 F.3d at 327. When an ALJ does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021). Typically, a remand is also appropriate when the decision is not supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

## II. BACKGROUND

Claimant was 39 years old when his alleged disability began. [*See* Dkt. 18-5 at 2.] He has earned an associate degree in business administration. [Dkt. 18-2 at 37.] He has worked as a substitute teacher and vending service attendant. [Dkt. 18-6 at 4.][3]

The ALJ followed the five-step sequential evaluation in 20 C.F.R. § 404.1520(a)(4) and concluded that Claimant was not disabled. [Dkt. 18-2 at 25.] Specifically, the ALJ found as follows:

- At Step One, Claimant had not engaged in substantial gainful activity[4] since March 9, 2018, the alleged onset date. *Id.* at 18.

- At Step Two, Claimant had "the following severe impairments: peripheral neuropathy, degenerative disc disease, Meniere's disease, and hypertension." *Id.* (citations omitted).

- At Step Three, Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. *Id.* at 20.

---

[3] The relevant evidence of record is amply set forth in the parties' briefs and need not be repeated here. Specific facts relevant to the Court's disposition of this case are discussed below.

[4] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

- After Step Three but before Step Four, Claimant had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant can no more than occasionally climb ramps and stairs and can never climb ladders, ropes, or scaffolds. The claimant can no more than occasionally balance, stoop, kneel, crouch, or crawl. The claimant must take normal seizure precautions, including but not limited to avoiding unprotected heights, ladders, ropes, and scaffolds, and exposure to unmanned moving, dangerous machinery. The claimant must avoid commercial driving. *Id.* at 21.

- At Step Four, relying on the testimony of the vocational expert ("VE") and considering Claimant's RFC, Claimant was incapable of performing his past relevant work as a vending machine servicer and teacher's aide. *Id.* at 23-24.

- At Step Five, relying on the VE's testimony and considering Claimant's age, education, work experience, and RFC, Claimant could perform other work with jobs existing in significant numbers in the national economy in representative occupations like a table worker, document preparer, and addressing clerk. *Id.* at 24-25.

### III.  DISCUSSION

Claimant asserts two errors, arguing that: (1) the ALJ failed to account for limitations caused by his orthostatic hypotension and hypoglycemia unawareness;[5] and (2) the ALJ erred by concluding that 49,000 jobs in the national economy is a significant number of jobs. The Court will address the arguments as necessary to resolve the appeal.

**A. Orthostatic Hypotension and Hypoglycemia Unawareness**

---

[5] Hypoglycemia, also known as low blood sugar or low blood glucose, is most common with people who have diabetes, and while blood glucose varies throughout the day, "for most people, low blood sugar is defined as below 70 mg/dL (milligrams per deciliter). Severe hypoglycemia usually happens at lower levels and is generally defined as a low blood sugar event that requires the assistance of someone else in order to correct the low blood sugar. Severe hypoglycemia is dangerous and needs treatment right away." Cleveland Clinic, *Hypoglycemia (Low Blood Sugar)*, https://my.clevelandclinic.org/health/diseases/11647-hypoglycemia-low-blood-sugar (last visited May 12, 2022). "Some people don't have symptoms or don't notice them. Healthcare providers call that situation hypoglycemia unawareness. People with such a challenge aren't aware when they need to do something about their blood sugar. They're then more likely to have severe episodes and need medical help. People with hypoglycemia unawareness should check their blood sugar more often." *Id.*

Claimant started experiencing dizziness in August 2018, and he fainted in the hospital after a cystoscopy in October 2018.  [Dkt. 18-9 at 288.]  On December 10, 2018, he underwent cardiovascular diagnostic testing including a tilt table assessment, reporting that he continued to have dizzy spells three-to-four times a week that lasted up to thirty minutes, but position changes had helped without any further fainting episodes.  *Id.*  The findings included that Claimant had abnormal blood pressure and heart rate responses to "head up tilt," and "[m]ixed vasodepressor and cardioinhibitory response to head up tilt with mild hypotension and bradycardia recorded in association with symptoms of presyncope . . . ."  *Id.* at 289.  "Syncope was not observed," but the findings were "typical of a mixed vasodepressor/cardioinhibitory response to head up tilt table testing consistent with vasovagal/neurocardiogenic mechanisms of presyncope."  *Id.*

On December 12, 2018, emergency medical services were dispatched to Claimant's residence after a 911 call.  [Dkt. 18-10 at 113.]  Claimant's father explained that Claimant's blood sugar was low, his blood sugar was 29 mg/dL, and corrective action was taken, but he refused to be taken to the hospital.  *Id.*  On January 15, 2019, Claimant started treating with an endocrinologist and he reported "[h]is main problem with his diabetes treatment [was] hypoglycemia, severe, with hypoglycemia unawareness.  He [was] treated with glucagon[6] 1-3 times/month.  He has had several EMS calls for hypoglycemia."  [Dkt. 18-9 at 325.]  Claimant was checking his glucose four time per day, and the specialist explained that the glucose data that he reviewed from Claimant's log showed "frequent hypoglycemia."  *Id.*  Claimant's diagnoses included diabetes mellitus, "type 1, with frequent severe life[-]threatening

---

[6] Glucagon is a natural hormone produced in the pancreas that increases a person's blood sugar level, while insulin, another hormone decreases blood sugar levels.  Cleveland Clinic, https://my.clevelandclinic.org/health/articles/22283-glucagon (last visited May 10, 2022). A synthetic form of glucagon can be administered by injection or a dry (powder) nasal spray in "emergency situations" to treat "very low blood sugar."  *Id*.

hypoglycemia and hypoglycemia unawareness," and hypotension associated with his diabetes, thyroid disease, and celiac disease.  *Id.* at 329-30.

Concerning ongoing treatment for hypoglycemia, on August 30, 2019, Claimant reported to his endocrinologist that "[v]ery recently there was an incident at his local [Walmart] with hypoglycemia that led to police being called, [because] the [Walmart] staff thought [that] he was trying to shoplift."  [Dkt. 18-11 at 132.]  On November 26, 2019, Claimant's endocrinologist explained that a recent camera study had recorded an episode of hypoglycemia.  *Id.* at 127.

Regarding ongoing treatment for hypotension, on May 1, 2019, Claimant reported to his cardiologist that he was "having 4-5 dizzy spells daily," blood pressure was getting as "low as 80/60," and he was taking medication "during these occurrences and lifting [his] legs up."  *Id.* at 60.  His diagnoses included chronic orthostatic hypotension and dizziness.  *Id.* at 61.  On June 19, 2019, Claimant reported that he was "occasionally symptomatic with low blood pressure" with fatigue, dizziness, sweating, and disorientation, but that he felt better after taking medication "within 30 minutes" when he sat down and raised his legs up.  *Id.* at 51.  A "gastric emptying scan showed delayed emptying."  *Id.*  On September 18, 2019, he reported "still having 6-8 dizzy spells a week and the lowest [blood pressure] recorded was 79/59 and several were in the [80s/60s]."  *Id.* at 48.  His blood pressure was recorded as 100/72 in the office, and he felt okay at that level, but reported that he felt dizziness coming on when it dropped into the 90s.  *Id.*  He was "[u]sing . . . midodrine at home as needed . . . and [got] a response [within] 40-60 minutes – once it kicks in[,] he is [okay]."  *Id.*  On December 9, 2019, Claimant's cardiologist explained that he needed "an increase[d dosage of] midodrine to 5 mg tablets to help keep out of attacks and to help him pull out of an attack more efficiently.  Attacks are more frequent [and] the 2.5 mg tablet [was] not effective."  *Id.* at 45.

Claimant testified that his "blood sugar [was] a real struggle. And the pain with my neuropathy and all my Meniere's episodes and low blood pressure episodes, and then going to doctor's, it's a full-time job in itself." [Dkt. 18-2 at 43.] Claimant explained:

> My mom, you know, she's there for me . . . all the time and she calls. She tries to call me five, six, seven times a day to make sure that I'm, you know, around, you know, up and going and if I'm not, then she comes over there and she many times [has] had to give me emergency glucagon injection when I'm unconscious. And I'm still breathing, but I'm not coherent and it's been, you know, there's been many, many times – countless times that she's had to do that for me. And she's the one that cooks all my meals and cleans up around the place because I'm not up with –

*Id.* at 44. He testified to having "low blood pressure episodes . . . 10 to 15 times a week, you know, roughly. And that's why I take the [midodrine] as needed and it's a real struggle with that getting busy with that and, you know, the Meniere's disease too, the room's spinning and everything too." *Id.* at 47. Claimant explained that after taking the medication, he had "to relax for at least, you know, about an hour or so before I got—I'll keep checking. I'll check my blood pressure again and it'll be back up to normal finally and then, yeah. So I'd probably—every time that happens I waste at least an hour trying to wait on it to come back up and feel normal again." *Id.* at 47-48. Concerning Claimant's "vertigo episodes," he testified:

> Those can last, you know, anywhere from 20 to 30 minutes. I'll take a Valium and then it'll help it die down, but it'll take time [for] that [to] die[] down, that takes another, you know, 40 minutes or so before it finally dies down and then that takes a lot out of me when that happens, and I'll normally lay down and relax for a while after that. Yeah, and then—and just like those low blood sugar episodes, when those happen, especially when I have to have a glucagon injection, I get dry heaves and throw up and every[thing] else from that and that takes a lot out of me when I got [sic] to have those glucagon injections and it's terrible.

*Id.* at 48. Asked how often he needed glucagon injections, Claimant testified:

> On an—I mean, sometimes it'll ramp up where I'll have it, you know, my mom will have to give them to me, you know, six times in a month and then sometimes it'll calm down a little bit and then it'll ramp back up, you know. But, you know,

8

>on average, you know, four to six—I mean, six times [a] month[], up to that, some[]times a couple times, but I have low blood sugar[] all the time and that's why my mom's got to check on me so much because she's worried that I'm not going to be alive.

*Id.* at 48-49. He also testified that he stopped working in March 2018 as a substitute teacher because with his blood sugar issues, neuropathy, "first Meniere's episode," and "low blood pressure episodes," he "couldn't be reliable to them anymore." *Id.* at 54.

The ALJ did not mention "hypotension" or "hypoglycemia." The Seventh Circuit has explained that "the ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires [her] to do." *Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985). The Seventh Circuit has clarified that an ALJ need not "address every single piece of relevant evidence that cuts against [her] decision." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (collecting cases). An "ALJ doesn't need to address every piece of evidence, but . . . she can't ignore a line of evidence supporting a finding of disability." *Id.* (citing *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010)). Likewise, the SSA's guidance requires that the ALJ explain her RFC finding by resolving "material inconsistencies and ambiguities" in the record. Social Security Ruling ("SSR") 96-8p (S.S.A. 1996), 1196 WL 374184, at *7.

The Commissioner contends that "[t]he ALJ made plain that she considered [Claimant's] hypotension and low blood sugar (hypoglycemia), contrary to [Claimant's] assertions." [Dkt. 28 at 8.] "First, the ALJ expressly acknowledged [Claimant's] testimony wherein he 'described episodes of low blood pressure and vertigo[.]'" *Id.* (quoting [Dkt. 18-2 at 21]). Second, the ALJ cited Claimant's functional reports that he submitted to the SSA, and Claimant described having low blood sugar incidents in those reports. *Id.* "Third, the ALJ expressly considered [that Claimant] was 'diagnosed with type I diabetes mellitus with diabetic polyneuropathy.'" *Id.* at 9

9

(quoting [Dkt. 18-2 at 22]). The Commissioner contends, "[t]hat's relevant because [Claimant] testified [that] his low blood pressure episodes were 'brought [on] by the diabetes over many years of having it,' and the ALJ considered [Claimant's] testimony." *Id.* (citing [Dkt. 18-2 at 21-22; Dkt. 18-2 at 47]). "Fourth and finally, the ALJ 'reviewed and considered the claimant's complete medical history.'" *Id.* (quoting [Dkt. 18-2 at 22]).

In his reply, Claimant contends that the "sequence" of contentions above, made by the Commissioner to assure the Court that "the ALJ considered [Claimant's] two primary bases for disability, despite not actually mentioning them," "would be somewhat humorous if the stakes were not so high for" Claimant. [Dkt. 31 at 1-2.] The Court agrees. The ALJ solicited testimony from the VE that established that an individual could not sustain competitive work if, on an ongoing basis, he needed to: take breaks for ten minutes or more per hour; miss more than one day per month; miss more than ten percent of a workday; or could not sit, stand, and walk alone or in combination for eight hours in a workday. [Dkt. 18-2 at 61.] Claimant's counsel did not cross-examine the VE, explaining that "[t]hose last few questions really captured our theories about why [Claimant] should be considered disabled, so I don't have any further questions." *Id.* Beyond providing citations to evidence that included references to Claimant's hypotension and hypoglycemia that the ALJ did not expressly acknowledge, the ALJ's general statement that she considered the entire medical record, and one reference to Claimant's testimony as describing episodes of low blood sugar and dizziness, the ALJ completely ignored Claimant's potentially disabling conditions. The ALJ gave no indication that she was aware that Claimant had episodes of hypoglycemia. She gave no indication that she considered any of the supporting objective

10

evidence detailed above,[7] including the tilt table testing, a dangerously low blood sugar level recorded by emergency responders, Claimant's cardiologist's review of his glucose logs as showing frequent hypoglycemia, the camera study showing a hypoglycemia episode, recorded blood pressure values, and a gastric emptying study identifying a possible cause of some of his metabolic problems.  The ALJ gave no indication that she considered Claimant's reports to his providers about the frequency of his various episodes, his reports about their severity, and his testimony about how long it took him to recover from those episodes after taking corrective action.  The ALJ did not explain how she reached her material conclusions concerning those lines of evidence.  The ALJ "must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citations omitted).  Being generous, perhaps the ALJ thought that a severe impairment that she recognized, hypertension, also covered Claimant's episodes of hypotension.  And she did at least mention Claimant's diabetes mellitus, though she did not list the impairment as a severe impairment or explain that it was not a severe impairment.  Still, the ALJ's failure to engage with Claimant's specific blood pressure and diabetes issues gives the Court no indication that she properly considered the facts of the case.  Meaningful review is thus precluded by the glaring omissions.

      The Commissioner makes other arguments about how the ALJ could have rationalized rejecting disability based on the record regarding Claimant's relevant impairments.  [*See, e.g.*, Dkt. 18 at 9.]  But the Commissioner cannot "defend the agency's decision on grounds that the

---

[7] Except the tilt table assessment, none of the medical evidence cited by the Court in this Entry was reviewed by the state agency medical experts.  [*See* 18-3 at 43-53 (showing last review completed January 4, 2019, as well as listing the evidence that had been received at the reconsideration phase).]

agency itself did not embrace." *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.") (additional citations omitted)).

While overlooking the relevant objective evidence detailed above, the Commissioner contends that "the limiting effects of [the Claimant's various] episodes [are] almost entirely the product of [Claimant's] subjective assertions, which the ALJ considered and discounted without challenge from [Claimant]." [Dkt. 28 at 1.] Claimant did not challenge the ALJ's subjective symptoms evaluation directly, but he did allege that the ALJ failed to consider the entire pertinent record. If a fully favorable determination cannot be made based solely on the objective medical evidence, SSR 16-3p directs the ALJ to consider "all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms . . . ." SSR 16-3p (S.S.A Oct. 25, 2017), 2017 WL 5180304, at *6-8. This includes the regulatory factors relevant to a claimant's symptoms, like daily activities, the location, duration, frequency, and intensity of pain or other symptoms, factors that precipitate and aggravate the symptoms, the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; and treatment, other than medication, an individual receives or has received for relief of pain or other symptoms. *Id*. at *7-8; 20 C.F.R. § 404.1529(c)(3). Not only did the ALJ fail to acknowledge virtually all the relevant evidence, the Court does not find any rationale advanced by the ALJ to support her conclusion that Claimant was not credible, other than she did not think the "physical examinations" with "largely normal results" supported his alleged exertional limitations from his neuropathy. [Dkt. 18-2 at 22.] An ALJ may not rely solely on a lack of objective verification of Claimant's allegations of pain. *See, e.g.*, *Adaire v. Colvin*, 778

F.3d 685, 688 (7th Cir. 2015); *see also* Cole v. Colvin, 831 F.3d 411, 412 (7th Cir. 2016); SSR 16-3p, 2017 WL 5180304, at *4-5.

Accordingly, remand is necessary for further consideration of the entire record including Claimant's hypotension and hypoglycemia, his RFC, and his subjective allegations.

**B. Significant Number of Jobs**

Claimant contends that even if all the ALJ's findings through Step Four of the sequential evaluation were sound, Claimant should be awarded disability by the Court because the ALJ failed to meet her burden at Step Five to demonstrate that there was a significant number of jobs that Claimant could perform with his RFC. *See* [Dkt. 27 at 14]. By statute:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A). Claimant contends that because the representative occupations relied on by the ALJ at Step Five totaled only approximately 49,000 jobs nationally and the ALJ did not elicit testimony that established that those jobs were present either in the region where Claimant lived or in several regions of the country, the Court has the "discretion and authority" to conclude that Claimant does not have the ability to perform a significant number of jobs and therefore an award of benefits is appropriate. [Dkt. 27 at 15-17.] *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005) ("An award of benefits is appropriate only where all factual issues have been resolved and the 'record can yield but one supportable conclusion.'" (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993))).

13

However, Claimant acknowledges that some of the unresolved questions here about the distribution of the 49,000 jobs that the ALJ relied upon "could be hashed out with additional vocational testimony if the Court were to remand this case . . . ." [Dkt. 27 at 17.] The Court finds that to be the correct course of action here. On remand, the ALJ shall take care that any finding at Step 5 is supported by substantial evidence.

## IV.  CONCLUSION

For the reasons explained above, the Court **REVERSES** the ALJ's decision denying Claimant benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C.§ 405(g) (sentence 4) as detailed above.

SO ORDERED.

Dated:  17 MAY 2022

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record
via email generated by the Court's ECF system.